STATE OF MAINE
Sagadahoc, ss

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-00-26
W5b-SAG- 7/22/2003

ALAN BALLARD,

Plaintiff

v.

DECISION

CHRISTOPHER WAGNER, et al,

Defendants

DONALD L. GARBRECHT
LAW LIBRARY

AUG 5 2003

FACTS:

Plaintiff has sued defendants for defamation. I find the following facts:

On January 13, 2000 the Chief Fire Inspector delivered a large batch of deficiency violations to the public works department ("PWD") at the Naval Air Station, Brunswick ("NASB"). See Ex. 13

Deficiency violations result from regular Fire Department inspections on the base. The deficiency notices contain a description of the deficiency and a risk assessment code ("RAC") number that ranges from one to five with one being the most serious. Depending on the RAC number, the PWD has a certain time frame to correct the deficiency, with the time ranging from immediate action for a Code 1 to weeks for a Code 5. In any event the PWD must notify the Fire Department within 30 days of the corrective or abatement action taken by the PWD. See Ex. 13 and Ex. 21 under "Background Information".

The PWD officer in charge at NASB during the period relevant to this case was Alan Ballard. Mr. Ballard was a full lieutenant in the Navy at the time. Although Lt.

Ballard was responsible for all the work carried out by the PWD, and although the batch of deficiency notices were sent to him, they were actually received by CW04 John Bond, who was Lt. Ballard's operations officer. See Testimony of Ballard and Bond. CW04 Bond sent the deficiency notices to Linda Arris, an information assistant, who was supposed to enter the notices into the PWD's computerized corrective action process. Ms. Arris either would not or could not process the deficiency notices. CW04 Bond gave her verbal instructions on entering the deficiencies. That failed to produce results. On February 9 CW04 Bond tried written instruction. They failed as well. Donald Cyr, the PWD shop foreman also tried to speak with Ms. Arris to no effect. See Testimony of Bond.

On the morning of February 17, CW04 Bond decided that something had to be done right away because the 125 deficiency notices were already four days beyond their 30 day action deadline. He went to Lt. Ballard with a plan to address all of the deficiency notices immediately. See Testimony of Bond.

Lt. Ballard approved the plan and authorized as much overtime as necessary to get the 125 deficiency notices corrected as soon as possible. He also arranged for an electrical parts representative to be at PWD all weekend to insure that the tradesmen would have the parts to complete the corrective actions (many of which involved replacing light bulbs and other electrical items). See Testimony of Ballard.

At 1 p.m. on February 17, Lt. Ballard learned from the base executive officer ("XO") that Christopher Wagner, president of Local R1-77, National Association of Government Employees ("NAGE"), had learned about the deficiency notice problem from Ms. Arris (who was the union secretary). The XO told Lt. Ballard that Mr. Wagner was going to report the situation to the base commanding officer ("CO") on the next day. See Testimony of Ballard.

Mr. Wagner made no effort to work through the chain of command by contacting either Lt. Ballard or CW04 Bond before reporting the deficiency problem to the XO and the CO. He testified that he tried to contact them and they weren't in their offices. But Lt. Ballard and CW04 Bond were in the PWD all day on the 17th, except for a short lunch, working on the deficiencies. Also Mr. Wagner testified that he talked with Lt. Ballard on either the 16th or a few days before the 17th (his testimony changed in mid-course). However, according to his own testimony he didn't learn about the problem from Ms. Arris until the 17th. Mr. Wagner also testified that he spoke to Mr. Cyr, the PWD foreman, on the 17th and told Cyr he would go to the CO if the deficiency problem wasn't resolved by noon. Surely Mr. Cyr would have reported that kind of ominous threat to either CW04 Bond or Lt. Ballard and neither of them confirmed this. In fact CW04 Bond and Lt. Ballard testified that there was no communication from Mr. Wagner of any kind concerning the deficiencies. Furthermore, CW04 Bond testified that when he tried to explain earlier to Mr. Wagner, as union president, that Ms. Arris was not putting the deficiency notices into the computer as instructed, Mr. Wagner brushed him off, saying "Linda Arris is your problem." On the question of whether Mr. Wagner tried to work with the chain of command, as he later claimed, Mr. Wagner's testimony is not credible.

On the morning of February 18, the NASB Commanding Officer, Capt. Keith Koon, after hearing from Mr. Wagner, read the "riot act" to the PWD, letting them know that he wanted the deficiency notice problem resolved as soon as possible. See Deposition Testimony of Koon at p. 10-11. (There are references in the deposition to the meeting being February 16 but the trial testimony fixed it at February 18.)

The PWD continued their all-out effort and had 90% of the deficiencies corrected by the Monday following the 17th. By late February, CW04 Bond and Lt. Ballard

believed that all of the deficiencies had been corrected or abated and the only thing left to do was the paperwork and some training. See Testimony of Bond and Ballard and Ex. 67. On March 6, 2000, Melvin Tardie, NAVOSH Manager, (NAVOSH refers to safety supervisor) wrote to Mr. Wagner that the deficiencies had all been abated. Mr. Tardie based that conclusion on information given to him by Lt. Ballard. See Ex. 58.

In fact, one of the 125 late deficiencies had probably not been corrected. This deficiency involved an oil leak from a furnace oil supply line. This deficiency had been addressed by tradesman Thomas Woods on February 25, 2000. He found no oil leaks and the deficiency was listed as corrected on February 25. This was reported to CWO4 Bond and Lt. Ballard. They had no reason to doubt Mr. Woods. See Ex. 64. However, Mr. Wagner learned from an unnamed source and verified on March 21, 2000 that the fuel leak still existed. (It could have been a new leak but the events of March 23 suggest that it was more likely the old leak). See Ex. 71.

Meanwhile on February 25, 2000, on a seemingly unconnected matter, Lt. Ballard negotiated a contract that awarded emergency repair work on weeknights and weekends formerly performed by the Seabees (who were leaving NASB) to an outside contractor. See Testimony of Ballard and Ex. 117. Lt. Ballard then went to Norfolk, VA. See Testimony of Ballard.

Hearing rumors that emergency weeknight and weekend work was being outsourced, Mr. Wagner exercised his union's right to an emergency negotiating session. On February 29, 2000 Mr. Wagner negotiated a tentative after hours emergency repair contract with Commander Spear that put Lt. Ballard's February 25th contract "on hold". See Ex. 7 and Testimony of Wagner. These conflicting contracts were possible because Capt. Koon had delegated the authority to make binding contracts to his subordinates. See Koon deposition transcript at p. 27-28.

4

When Lt. Ballard returned from Norfolk he insisted that the February 25th outsource contract could not be put "on hold". Capt. Koon, faced with conflicting contracts, sided with Lt. Ballard and against Cmdr. Spear, Mr. Wagner and his union. See Koon deposition transcript at pp. 49, 50 & 51.

Mr. Wagner was not happy that Capt. Koon had upheld Lt. Ballard's February 25 contract that awarded emergency work to outsiders. Nor was Mr. Wagner happy about the fact that Linda Arris was apparently going to be disciplined for her role in the deficiency delays. See Koon deposition transcript at pp. 57, 58.

On March 21, 2000, Mr. Wagner, without attempting to notify CW04 Bond, Lt. Ballard, the XO or Capt. Koon, or anyone else on the base, filed a complaint with the Occupational Safety and Health Administration ("OSHA"). Mr. Wagner complained to OSHA about the one oil leak that had not been fixed and the 124 other deficiencies that had been untimely fixed. Mr. Wagner did not stop there. He told OSHA there were 380 deficiency notices that had not been acted on by the PWD in a timely way, even though there were only 125. Mr. Wagner also told OSHA that "base wide", NASB employees "are" exposed to "fire/explosion and other hazards due to the official in charge not complying with Part 1960.30." See Ex. 14. At the time he made this statement, the only evidence Mr. Wagner had of an uncorrected deficiency at NASB was the oil leak at the child care center, which had a RAC4 risk assessment.

On March 23, 2000 an OSHA inspector arrived at NASB and conducted an investigation. The narrative of the investigation is contained in Exs. 17-25. The actual notices of unsafe working conditions found by the investigator are contained in Exs. 31-39.

The OSHA investigator's narrative must be read with great caution. Several of his opinions, as opposed to his factual observations, I find to be unsupported by the

evidence at trial. A prime example of this is his opinion on Ex. 24 in the second full paragraph that "some key administrators have not been honest and forthright in their statements to the CO." There was not an iota of evidence produced at trial to support that opinion. All of the evidence was to the contrary. The only evidence produced at trial that Lt. Ballard or any other person in the chain of command was dishonest was Mr. Wagner's testimony that he believed Lt. Ballard lied to safety officer Mel Tardie when he reported in late February that the deficiencies had been corrected. The only evidence Mr. Wagner had to make that accusation was that one deficiency out of 125 (the oil leak) was still uncorrected. To make an accusation of dishonesty on such flimsy evidence was completely reckless and irresponsible. The OSHA investigator was aware of the flimsiness of the evidence as it pertained to dishonesty. For him to repeat Mr. Wagner's unsupported accusation in his official OSHA narrative was equally irresponsible.

As for the OSHA investigator's notices of unsafe conditions, Exs. 31-39, they can be confusing if not read carefully. The OSHA investigator was conducting several simultaneous investigations, only one of which dealt with the PWD's failure to correct deficiencies in a timely fashion. That list of 125 untimely corrected deficiencies is Ex. 34. All but two of these deficiencies are labeled "serious" only because of the untimely correction. Of the two uncorrected deficiencies, one was the oil leak at the child care center. See Ex. 31. The other was a sticky panic bar on an exit door at the officers' and chiefs' dining room. See Ex. 38, Citation 2, Item 1. The panic bar deficiency was apparently found during the OSHA investigator's inspection and was not the subject of a deficiency notice. At least there was no deficiency notice pointed out to me at trial that referred to a panic bar.

6

At the beginning of the investigation, the OSHA investigator went first to Mr. Wagner. Mr. Wagner accompanied the investigator on his inspection on March 23.

Both the oil leak and the panic bar were fixed immediately after they were pointed out to PWD personnel. Although the oil leak was labeled serious by the OSHA investigator, he allowed PWD 30 days to fix it. This confirmed the original fire chief inspector's estimation that it was a RAC4 type problem.

During the OSHA investigator's inspection on March 23, he showed Mr. Wagner Ex. 64, which is the oil leak deficiency notice on which tradesman Thomas Woods reported that his February 25 examination revealed "no leak in space." Thus Mr. Wagner was aware on March 23rd that it had been reported to Lt. Ballard that the oil leak deficiency was not a problem. Mr. Wagner acknowledged at trial that the OSHA investigator showed him Ex. 64 but he claimed that he could not recall seeing the writing on the notice. This particular deficiency notice was the key to the OSHA investigation and it is not at all credible that Mr. Wagner could not recall seeing the "no leak" writing on the notice.

On March 15, 2000 Mr. Wagner requested copies of all of the 125 deficiency notices that had been acted on by the PWD. See Testimony of Ballard and Ex. 115. On March 24, 2000 Lt. Ballard left copies of most of the completed deficiency notices in Mr. Wagner's mailbox. The remainder were delivered by March 30, 2000. See Testimony of Ballard. On March 27, 2000, Lt. Ballard called Mr. Wagner to ask if he had received the completed deficiency notices. Mr. Wagner replied, "You will read about it in an ULP." ("Unfair Labor Practices"). See Testimony of Ballard. This was the day Mr. Wagner published MORELIES.COM, which is the subject matter of this suit for defamation.

In the early stages of trial Mr. Wagner testified that he would produce many more deficiencies that had not been corrected by the PWD prior to the time that Lt.

7

Ballard told Mr. Tardie and the CO that all deficiencies had been corrected. When the trial ended three days later, Mr. Wagner had produced none.

On the subject of the conflicting contracts, Mr. Wagner testified that he believed Lt. Ballard had contracted for the outside workers subsequent to the February 29 contract that Mr. Wagner negotiated with Cmdr. Spear. He claimed he believed this because Cmdr. Spear told him Lt. Ballard's February 25 contract would not become effective until the outside workers first appeared on the base. See Testimony of Mr. Wagner. Mr. Wagner's testimony was not corroborated by Cmdr. Spear (who did not testify) or anyone else. The likely reason for the lack of corroboration is that Mr. Wagner's testimony is not credible. Mr. Wagner is an experienced contract negotiator. No person with his experience would believe that a signed contract does not become effective until workmen set foot on the base. I find that Mr. Wagner knew on March 27th, when he published the MORELIES.COM website on the internet, that Lt. Ballard had contracted for outside workers on February 25, four days before Mr. Wagner negotiated his contract for in-house workers.

On March 27, without notice to Lt. Ballard, the CO or anyone else in the NASB chain of command, Mr. Wagner published MORELIES.COM. See Testimony of Wagner and Exs. 1-14.

Mr. Wagner published the contents of MORELIES.COM on the internet from March 27, 2000 to June 2, 2000. He refused to publish a requested retraction. See Testimony of Wagner and Ballard.

At all times in regard to the publication of MORELIES.COM, Mr. Wagner acted as president of Local R1-77, NAGE and on the union's behalf. See Testimony of Wagner.

8

The defamatory statements in this case are contained in a website publication called MORELIES.COM, published by defendant Christopher Wagner on the internet from March 27, 2000 to June 2, 2000. See Exs. 1-11.

The parties agree that Mr. Ballard was a public official at the time of the publication and there is no doubt that the publication concerns public business. Therefore, to recover for defamation Mr. Ballard must prove not only that the publications were defamatory but that Mr. Wagner made them with actual malice. New York Times Co. v. Sullivan, 376 U.S. 254 (1964).

Maine law holds that words falsely written are libel per se if they relate to a profession, occupation or official station in which the plaintiff was employed. Saunders v. VanPelt, 497 A.2d 1121, 1124, 1125 (Me 1985). Mr. Wagner in his publication MORELIES.COM was making statements about then Lt. Ballard's occupation and official station as head of the Department of Public Works at the Naval Air Station, Brunswick.

The next question is whether Mr. Wagner wrote his words falsely. I am satisfied that he did. On Exhibit 3, Mr. Wagner wrote on his MORELIES website:

"The Command representative signed an agreement on 29 Feb 00 placing the contracting out scope of work on hold.... the work was then contracted out by Lt. Ballard's R01CC office DESPITE THE 29 FEB 00 AGREEMENT WITH THE COMMAND AND IN SPITE OF THE CO'S AND XO'S APPARENT DESIRE TO KEEP THE WORK IN-HOUSE." (Emphasis in the original)

The ordinary reader reading these statements would conclude from the use of the words "then" and "despite" and "in spite of" that Lt. Ballard contracted out the work after the commanding officer's representative had signed an agreement to keep the work in house. This sets up the clear implication that Lt. Ballard contracted the

work to outsiders over the known objection of his commanding officer. This is a very serious charge against any subordinate. It is an especially serious charge against a regular naval officer.

Furthermore it is false. The evidence is clear that Lt. Ballard negotiated his agreement for outside work four days before Mr. Wagner as president of the union asked for an emergency negotiating session with Commander Spear in Lt. Ballard's absence. The evidence is clear that Lt. Ballard had his CO's authority to negotiate a binding contract. The evidence is clear that when Capt. Koon learned of the conflicting contracts, he sided with Lt. Ballard. None of this information appeared in MORELIES.COM.

Mr. Wagner had knowledge of the falsity of his statement when he published MORELIES.COM. He had a copy of the body of Lt. Ballard's February 25 contract with him at the negotiation on February 29. As discussed above, his assertion that he did not believe Lt. Ballard's earlier contract became a contract until the outside workers walked onto the base is ridiculous, especially for an experienced union negotiator like Mr. Wagner. To imply that Lt. Ballard worked to circumvent his commanding officer's wishes when Lt. Ballard did nothing of the kind is inexcusable and actionable.

The damage caused by Mr. Wagner's false accusations is clarified when the accusation is examined in context. The first page of MORELIES refers not just to a single lie but to "the top lies" and "a pattern of incomplete information presented to the commanding officer by some senior managers...." (Emphasis in the original). The first page says the CO is being "hung out to dry" by those seeking to "protect their own interests, egos and jobs." Immediately below this line, page one of MORELIES invites the reader to check on "Lie #1 and "Lt. Ballard's little Fib." Lt. Ballard is the only senior manager mentioned by name on page one. See Ex. 1.

10

If the reader of MORELIES clicks on "Lt. Ballard's Little Fib," the reader brings up the conflicting contracts statements discussed above with the words "LIE" and "TRUTHS" to the left of the statements. Although the penciled in word "Lie" (penciled in by Mr. Wagner, he reluctantly admitted) actually refers to another statement supposedly made by Lt. Ballard (which itself was not proven) the context read as a whole makes it clear that Lt. Ballard is being accused of lying to his commanding officer as well as working behind the CO's back. There can be no more serious or harmful accusation against a naval officer.

The circumstantial evidence builds a clear and convincing case that Mr. Wagner knew his statements in Exhibit 3 concerning the conflicting contracts were false. The only evidence to the contrary came from Mr. Wagner and on this point, as on so many others, Mr. Wagner's testimony is not credible. His testimony does not in any way weaken the case built by the circumstantial evidence. Therefore I am satisfied on this particular defamation issue that Mr. Wagner defamed Lt. Ballard with actual malice.

On Exhibit 9, Mr. Wagner accuses Lt. Ballard of lying when he informed Mr. Tardie (the NASB command representative for safety) that all of the deficiencies had been abated at least by March 6, 2000. Just to make sure that his readers understood, Mr. Wagner penciled in the word "LIE" (Emphasis in original) next to the line "... "at this time Public Works has informed us...". Lt. Ballard had been identified on the web page as the Public Works Officer in the previous defamation. See Ex. 3.

To accuse a naval officer of lying in the performance of his official duties is, of course, defamatory if false. In this case, it was false. Lt. Ballard had very good reason to believe that all of the deficiencies had been corrected. The only specific example used by Mr. Wagner in MORELIES.COM as proof of the lie was the leaking fuel supply line at the childcare center. On February 25, 2000, the PWD chain of command had been

informed by a qualified tradesman that there was no leak at the childcare center. The PWD chain of command had also been informed by late February that all of the deficiencies had been corrected or abated. Therefore when Lt. Ballard reported to NAVOSH prior to March 6 that all of the deficiencies had been abated, he was telling the truth as he knew it and he had very good reason to believe he was telling the truth.

Did Mr. Wagner know on March 27 when he published MORELIES that Lt. Ballard had good reason to believe he was telling the truth? Mr. Wagner was with the OSHA investigator on March 23rd. All of the witnesses agreed that the OSHA investigator and those with him carefully examined the completed deficiency notice in which tradesman Woods reported no leaks and in which he reported the deficiency completed on February 25th. Mr. Wagner acknowledged on the witness stand that he looked at the completed deficiency notice. He did not deny seeing Mr. Woods' report of no leaks. Instead he testified that he "couldn't recall" whether he saw the writing on the deficiency notice. But this particular deficiency is what led Mr. Wagner to file his complaint with OSHA in the first place. It was the center of attention on March 23rd because it was the only one of the 125 deficiencies in question that was still uncorrected. I am satisfied that Mr. Wagner saw Mr. Woods' writing and chose to ignore it when preparing his website.

My finding is supported by Mr. Wagner's choice of documentation on MORELIES to support his accusation. He included the letter from NAVOSH to himself that refers to Lt. Ballard's report. See Ex. 10. He included the initial deficiency notice filled out by the fire inspector with no writing on it. See Ex. 11. He included the cover letter from the Fire Department to prove that Lt. Ballard received the deficiency notices. See Ex. 13. He failed to include the completed deficiency notice even though he knew it existed. See Ex. 105.

12

In other words, he could have included the completed deficiency and argued that public works had done a poor job of correcting this particular deficiency. Instead he chose not to include the completed deficiency report. That way he could accuse Lt. Ballard of reporting all the deficiencies abated when the carefully selected documents on the MORELIES website suggest that this particular deficiency had never even been addressed. In other words Mr. Wagner could call Lt. Ballard a liar.

This manipulation of documents and Mr. Wagner's familiarity with the PWD chain of command leads me to conclude by a clear and convincing standard that on March 27, 2000 Mr. Wagner had a very good reason to believe that Lt. Ballard was telling the truth as he understood it when he reported that all of the deficiencies had been abated.

For Mr. Wagner to call Lt. Ballard a liar under these circumstances is almost certainly a knowing falsehood. At the very least, it is clear and convincing that Mr. Wagner recklessly disregarded the truth.

Lt. Ballard also claims that Ex. 14, which is a copy of the original complaint from Mr. Wagner to OSHA, is a separate libel unto itself.

Mr. Wagner's complaint to OSHA was in fact a gross exaggeration of the risk created by PWD's untimely correction of the deficiency notices at issue in this case. Mr. Wagner reported 380 deficiency notices when only 125 existed. Mr. Wagner had no evidence of any immediate risk of explosion or fire. The one specific uncorrected deficiency cited by Mr. Wagner in his complaint to OSHA had a RAC4 assessment for risk from the fire department and Mr. Warner knew it was a RAC4 risk.

However, despite the gross exaggeration there is a kernel of truth to Mr. Wagner's complaint to OSHA. Deficiencies not corrected in a timely manner do create a hazard, however remote. Mr. Wagner's complaint about the threat of explosions and

fire "base wide" amounts to a gross exaggeration rather than an outright false statement. On this issue, I find no defamation.

In summary, I find that Mr. Wagner defamed Lt. Ballard twice with actual malice both times.

As for damages, because I am satisfied that both instances of defamation are defamation per se, no proof of monetary damage is necessary. Although not required, Lt. Ballard attempted to prove monetary damages regarding his vacation pay. I find that evidence to be too speculative.

Compensatory damages may include the elements of mental suffering, humiliation, embarrassment and effect upon reputation, so far as they have been proved or may reasonably be presumed. Saunders v. VanPelt, 497 A.2d 1121, 1126 (Me. 1985)

I am satisfied that Lt. Ballard suffered a great deal of anguish and embarrassment and probably damage to his reputation. Those who knew him well such as Capt. Koon continued to think highly of him because he was, in Capt. Koon's words, an exemplary naval officer. However, this publication was on the internet. The Navy is a small community but there must have been plenty of naval officers who had not worked with Lt. Ballard. Lt. Ballard received calls and e-mails from all over the country and beyond asking him what was going on. It could not have done Lt. Ballard's reputation any good to be accused of lying in the performance of his official duties and of working against the wishes of his CO and of leaving his CO hung out to dry.

Lt. Ballard testified as to the anguish he suffered. I find that testimony to be credible. He testified that the unofficial motto of the post Vietnam Navy is Honor, Courage and Commitment. The first word is Honor. By all accounts, Lt. Ballard took the Navy motto very seriously. To be branded a liar, even in the context of a labor

14

dispute, is a very serious charge. It ruined Lt. Ballard's last several months in the Navy. When a person has the end of an honorable 23 year career ruined in this totally unjustifiable and uncalled for manner, that person is entitled to compensation.

On plaintiff's complaint for defamation, plaintiff Alan Ballard is awarded judgment against defendant Christopher Wagner and, vicariously, Local R1-77, National Association of Government Employees, in the amount of $75,000 plus interest and costs.

The clerk will schedule a second hearing in September so that the parties can present evidence on the issue of punitive damages.

This Decision and Order shall be entered on the docket by reference.


Dated: July 21, 2003                    _William S. Brodrick_____
                                        William S. Brodrick,
                                        Superior Court Justice, Active Retired



                                                        JUL 2 2 2003